UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ELIZABETH REID,

        Plaintiff,

                                       Case No. 20-cv-1406-pp

    v.

WROUGHT WASHER MANUFACTURING, INC.,

        Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 29) AND DISMISSING CASE**

---

On September 10, 2020, the plaintiff filed a complaint alleging that her former employer had violated the Family and Medical Leave Act of 1993 (FMLA). Dkt. No. 3. The plaintiff alleges the defendant (1) interfered with her FMLA rights in violation of 29 U.S.C. §2615(a)(1) and (2) retaliated against her for exercising her FMLA rights in violation of 29 U.S.C. §2615(a)(2). Id. at ¶¶32-39. On January 18, 2023, the defendant filed a motion for summary judgement arguing that the undisputed evidence demonstrates that it did not violate the FMLA. Dkt. No. 30.

On August 7, 2024, the court held a hearing, seeking clarification of several facts. Dkt. No 47. On September 5, 2024, the court held a follow-up hearing where the parties provided responses to the court's questions. Dkt. No. 48.

1

The court will grant the defendant's motion for summary judgment and dismiss the case.

**I.    Facts**

A.    <u>The Plaintiff's Position and Pre-FMLA Request Performance</u>

The defendant is a manufacturing company headquartered in downtown Milwaukee; it supplies high-quality washers for a broad range of markets including automotive, agricultural, electrical, appliance, construction equipment and material handling. Dkt. No. 37 at ¶¶1-2. The plaintiff originally was hired by Franklin Tool & Die (a company owned by the defendant) on February 2, 1997 as its assistant operations manager. <u>Id.</u> at ¶3. The plaintiff then became employed by the defendant in 1997 or 1998, when the defendant consolidated the Franklin Tool & Die operations into its own Milwaukee plant. <u>Id.</u> at ¶4. The plaintiff held various positions while employed with the defendant, including quotations analyst, quotations manager and outside sales positions such as territory sales manager and sales manager. <u>Id.</u> at ¶5.

In 2016, Jeff Liter became the defendant's president. <u>Id.</u> at ¶6. At that time, the plaintiff worked for the defendant as sales manager. <u>Id.</u> at ¶7. Liter had serious questions about the plaintiff's outside sales ability, specifically the way the plaintiff interacted with customers, which the plaintiff says was immaterial to the decision to terminate her years later. <u>Id.</u> at ¶8. The plaintiff testified in her deposition that she and Liter had a "not great" but "productive" working relationship. <u>Id.</u> at ¶11 (quoting Dkt. No. 32 at 9 (Tr. p. 37 at lines 12-19)). Liter eventually replaced the plaintiff with Kent Carter and moved the

2

plaintiff to the position of territory sales manager. Id. at ¶9. Later, the defendant transitioned the plaintiff out of sales altogether and moved her into product development at the defendant's Milwaukee office, where she reported to Carter. Id. at ¶10.

In approximately December 2018, the defendant made the plaintiff a "New Product Development Manager." Id. at ¶12; see also Dkt. No. 32-1 at 4 (Tr. p. 12 at lines 17-22). The plaintiff retained that salaried position until her termination in July 2020. Dkt. No. 37 at ¶12. Because the plaintiff was a salaried employee, Carter expected her to work "typically 50, sometimes 60" hours a week. Dkt. No. 32-2 at 7 (Tr. p. 19 at lines 2-8).

As a new product development manager, the plaintiff was the quoting supervisor responsible for responding to requests for quotations ("RFQs") from the defendant's customers or potential customers. Dkt. No. 37 at ¶13. Liter testified in his deposition that the plaintiff had another "fairly new hire" working on RFQs and that the plaintiff was responsible for assigning the RFQs that "she didn't do" herself. Id.; see also Dkt. No. 32-4 at 8, 10 (Tr. p. 24 at lines 8-13, p. 32 at lines 11-13). RFQs are formal requests from the defendant's customers for the defendant to state whether it can manufacture a product, at what price and under what conditions Dkt. No. 37 at ¶14. Effective and timely responses to RFQs are essential to the defendant's business. Id. at ¶15. RFQ responses are usually competitive exercises, in which other companies—the defendant's competitors—are asked to respond to the same RFQs. Id. at ¶16. When issuing an RFQ, the customer sets a deadline for a response. Id. at ¶18.

3

To be in the best possible position to win the business from this competitive exercise, it is critical that the defendant respond to RFQs in a timely manner with competitive, yet achievable, pricing and terms. Id. at ¶17. Effectively responding to the RFQ's is not a "last-minute" task. Id. at ¶19. Preparing the RFQs requires planning ahead to gather information within the defendant's systems—such as ascertaining manufacturing capabilities, capacity and what machinery is available to perform the requested manufacturing project. Id. at ¶20. Preparation of RFQs also takes planning ahead to gather information from the customer issuing the RFQ because frequently there are questions that must be asked of the customer and information that must be gathered from the customer. Id. at ¶21. Generally, the defendant's customers do not appreciate answering questions at the last minute before an RFQ deadline and expect companies—like the defendant—to give them lead time as to any information necessary to respond to the RFQ. Id. at ¶22. For these reasons, the plaintiff's ability to timely act on RFQs was an essential component of her job and, as the defendant's lead person on RFQ responses, the defendant relied on the plaintiff to timely and effectively act on RFQs. Id. at ¶23.

The plaintiff admits that as far back as December 2018, Liter would get "angry periodically or frustrated" with the plaintiff "regarding quotes not done when he wanted them." Dkt. No. 32-1 at 9 (Tr. p. 31 at lines 7-25, p. 32 at lines 1-17). Carter testified in his deposition that he had "great concern that [the plaintiff] was not able to maintain the responsibilities that she was tasked with" and conveyed that to her several times. Dkt. No. 32-2 at 7 (Tr. p. 20 at

lines 1-22). The plaintiff insists that this was immaterial to her ultimate termination because Carter never warned the plaintiff, under the company's progressive discipline policy, that her job was in jeopardy. Dkt. No. 37 at ¶27.

In February 2019, Carter gave the plaintiff a "Verbal Warning"—which is documented in writing—about her work issues. Dkt. No. 37 at ¶24; see also Dkt. No. 32-5. At the time of the verbal warning, Carter noted that seven specific quotes "need[ed] to be completed ASAP." Dkt. No. 37 at ¶26; see also Dkt. No. 32-5. Carter maintains that he did not take that verbal warning into consideration when he made the later decision to discharge the plaintiff. Dkt. No. 32-2 at 10 (Tr. p. 31 at lines 13-17).

In April 2019, Liter and Carter met with the plaintiff to discuss their concerns with her job. Dkt. No. 37 at ¶30. The conversation did not include HR, and the plaintiff testified in her deposition that the meeting was "contentious" and that she believed that there were "many falsities pointed out to [her]" during that conversation. Dkt. No. 32-1 at 10 (Tr. p. 34 at lines 22-25, p. 35 at lines 1-18).

Starting in January 2020, the defendant had internal discussions about terminating the plaintiff based on her performance issues. Dkt. No. 37 at ¶31; see also Dkt. No. 32-4 at 6 (Tr. p. 14 at lines 23-25, p. 15 at lines 1-25, p. 16 at lines 1-8). The plaintiff asserts that this fact is immaterial because no one warned her that her job was in jeopardy or discussed her attendance with her "during 2019 or 2020 until she had to take FMLA leave[.]" Dkt. No. 37 at ¶31.

5

In March 2020, the COVID-19 pandemic hit and placed the defendant in a difficult financial position. Dkt. No. 37 at ¶32. As a result, the defendant began assessing needed layoffs, including the termination of unproductive employees, such as the plaintiff. Id. at ¶33. Carter testified in his deposition that he was unsure whether he would have terminated the plaintiff due to the financial problems regardless of her performance. Dkt. No. 32-2 at 8 (Tr. p. 22 at lines 6-9). Around March 2020, the defendant also asked employees in the plaintiff's department to take a day of furlough each week. See Dkt. No. 36 at ¶3 (citing Dkt. No. 32-2 at 14 (Tr. p. 49 at lines 14-17)); see also Dkt. No. 32-1 at 13 (Tr. p. 46 at lines 11-22).

B.    The Plaintiff's FMLA Requests

On April 14, 2020, the plaintiff requested FMLA leave so she could undergo an elective surgery. Dkt. No. 37 at ¶¶34-35. On May 13, 2020, the defendant approved the plaintiff's request to take leave from June 3 to July 15, 2020. Id. at ¶36. Between the date the plaintiff requested FMLA leave (April 14, 2020) and the date the defendant approved the request (May 13, 2020), the defendant never threatened the plaintiff with termination or other adverse employment actions. Id. at ¶37; see also Dkt. No. 32-1 at 19 (Tr. p. 70 at lines 1-25, p. 71 at lines 1-4).

The plaintiff testified that during this period she had or overheard three interactions reflecting Liter and Carter were "upset" she was taking FMLA.[1]

---

[1] At the September 5, 2024 hearing, the plaintiff clarified that her factual assertion that "Liter and Carter were upset that Reid was taking FMLA leave[,]" dkt. no. 36 at ¶4, stemmed from the three interactions discussed in her

6

Dkt. No. 36 at ¶4; see also Dkt. No. 32-1 at 14-17 (Tr. p. 53-65). First, the plaintiff testified that Carter mistakenly had told her that she had to take one to two weeks of vacation before using FMLA; the plaintiff corrected him based on what Denise Schuppert, the Human Resources Manager, had told her. Dkt. No. 32-1 at 16 (Tr. p. 58 at lines 4-19). Second, the plaintiff testified that Liter had approached her desk with a question about something and then commented, "I can't believe you're going to be gone." Id. at 16-17 (Tr. p. 59 at lines 7-21, p. 63 at lines 12-20). Finally, the plaintiff testified that she overheard parts of a conversation between Liter and Carter, where they said the plaintiff's name and "FMLA." Id. at 14-15 (Tr. p. 53 at lines 13-25, p. 54 at lines 1-7). The plaintiff admitted that she could hear "nothing specific" but said she "drew the conclusion that there was frustration that [she] was taking off, based on the volume of the discussion and tenor following it." Id. at 14 (Tr. p. 53 at lines 13-18).

On May 18, 2020, the plaintiff withdrew her FMLA request related to the surgery. Dkt. No. 37 at ¶38. The plaintiff informed the defendant that the surgery had been canceled due to the COVID-19 pandemic. Id. at ¶39; see also Dkt. No. 32-3 at 20 (Tr. p. 70 at lines 2-10). That same day, the plaintiff submitted a second FMLA request so that she could care for her mother, who had failing health and was facing end of life issues. Dkt. No. 37 at ¶¶41-42.

_____

deposition. See Dkt. No. 48. Beyond these three incidents, the plaintiff also referenced Carter's "grave concerns that Reid was not able to maintain the responsibilities she was tasked with given the stress that she was dealing with during her FMLA leave." See Id. (citing Dkt. No. 32-2 at 7 (Tr. p. 20 at lines 1-6)). The court will discuss Carter's "grave concerns" below.

7

The defendant approved the plaintiff for "intermittent" FMLA leave through the end of her mother's life. Id. at ¶45, 47. The defendant recommended that the plaintiff take FMLA leave to care for her mother; the plaintiff clarifies that it was Schuppert who recommended that the plaintiff take FMLA for the end-of-life issues with her mother. Id. at ¶¶43-44; see also Dkt. No. 32-1 at 18, 20 (Tr. p. 66 at lines 22-25, p. 67 at lines 1-10, p. 76 at lines 3-15).

The defendant explained to the plaintiff that she would not be paid for any FMLA leave she took. Dkt. No. 37 at ¶50; see also Dkt. Nos. 32-1 at 12 (Tr. p. 43 at lines 16-19). The plaintiff understood that if she still wanted to receive her full salary, she would be required to perform her full duties. Dkt. No. 37 at ¶55; see also Dkt. No. 32-1 at 13 (Tr. p. 47 at lines 15-21). The defendant allowed the plaintiff to work full-time while caring for her mother in Maryland and to use her FMLA leave on an "intermittent" basis when she needed to use it. Dkt. No. 37 at ¶48. The defendant instructed the plaintiff that if she wanted to use her intermittent FMLA, she would just have to give the defendant prior notice of when she would not be working. Id. at ¶49. Carter testified at his deposition that the plaintiff wanted to work full time and that they discussed this issue "many times." Id. at ¶51; see also Dkt. No. 32-2 at 7 (Tr. p. 18 at lines 15-21).

Ultimately, the plaintiff elected to not take any unpaid FMLA time and chose to work full-time between the approval of her intermittent FMLA and her termination. Dkt. No. 37 at ¶¶51, 53; see also Dkt. No. 32-1 at 13, 21-22 (Tr. p. 47 at lines 2-11, p. 78 at lines 20-24, p. 82 at 12-23). She says that she put in

forty hours of work on a varied schedule while she cared for her dying mother but that she could not maintain the fifty-to-sixty-hour workweeks that Carter expected from her.[2] Dkt. No. 38 at ¶2. When it became too much of a burden for the plaintiff to work and care for her mother at the same time, the plaintiff elected to use her paid vacation time—not unpaid FMLA time. Id. at ¶15. Because the plaintiff claimed that she was working full-time, the defendant paid her as a full-time employee and expected full-time performance from her. Dkt. No. 37 at ¶¶54-55.

The plaintiff's approved intermittent FMLA leave ended on June 18, 2020—the day her mother passed away. Id. at ¶46; see also Dkt. No. 32-3 at 9-10 (Tr. p. 29 at lines 22-25, p. 30 at lines 107). Shortly after her mother's passing, the plaintiff told Carter that she wanted to get back to work. Dkt. No. 32-2 at 8 (Tr. p. 24 at lines 17-23). Carter informed the plaintiff that "she was entitled to bereavement time" and "asked her to take that[.]" Id. Carter also "encouraged [the plaintiff] to take her time to grieve[.]" Id. at 8 (Tr. p. 25 at lines 2-3). The plaintiff testified at her deposition that she thought there would be more time to handle her mother's affairs, dkt. no. 37 (citing dkt. no. 32-1 at 20 (Tr. p. 77 at lines 2-4)), but said that she understands now that her mother's passing meant the end of FMLA leave, dkt. no. 32-1 at 10 (Tr. p. 36 at lines 14-

_____

[2] At the September 5, 2024 hearing, the parties clarified their understanding of what "working full-time" means. See Dkt. No. 48. The plaintiff stated that she understood "working full-time" as working forty hours a week—or thirty-two hours a week when the defendant asked employees to take one furlough day a week. Id. The defendant stated that it understood "working full-time" for a salaried employee to mean working the necessary amount of time to complete the employee's assigned responsibilities. Id.

9

22). It is undisputed that the plaintiff did not make an additional request for FMLA after her mother's passing. <u>See</u> Dkt. No. 32-1 at 13 (Tr. p. 47 at lines 22-25, p. 48 at lines 1-4).

The plaintiff remained in Maryland until at least July 13, 2020—the date of her mother's burial. Dkt. No. 37 at ¶82. Before the plaintiff knew the arrangements for her mother's funeral, she had told Carter that she would be returning to Wisconsin the week after her mother's death. <u>Id.</u> at ¶83. Upon learning of the funeral arrangements, the plaintiff informed Carter that she would be staying in Maryland until her mother's services in mid-July. <u>Id.</u> at ¶¶84, 85. At the time of the plaintiff's termination on July 16, 2020, Carter was frustrated that the plaintiff had yet to physically return to work in Milwaukee and that she chose to go to her home in Northern Wisconsin upon returning from Maryland. <u>Id.</u> at ¶85.

C.    The Two Wurth RFQs

In mid-2020, the defendant received two RFQs from a customer named "Wurth." Dkt. No. 37 at ¶56. Carter described these two RFQs as "very important packages for a large piece of business that [the defendant was] hoping to gain." <u>Id.</u> at ¶56; Dkt. No. 32-2 at 5 (Tr. p. 10 at lines 23-24). Carter testified at his deposition and averred in his declaration that the plaintiff "dropping the ball on either Wurth package would have warranted termination." Dkt. No. 37 at ¶59; <u>see also</u> Dkt. No. 32-2 at 5 (Tr. p. 10 at line 25, p. 11 at lines 1-3); Dkt. No. 31 at ¶29.

Wurth sent the first RFQ package to the defendant in early May 2020. Dkt. No. 32-2 at 5 (Tr. p. 11 at lines 17-19). Wurth set a deadline of early-to-mid June 2020 for the defendant to respond to the first package. Dkt. No. 37 at ¶57; see also 36 at ¶7. The parties dispute when, specifically, the first package was due and when the plaintiff completed her portion of the first package. The defendant claims that Wurth set the deadline for the defendant to respond to the first Wurth package as "the first Friday in June" (which was June 5, 2020). Dkt. No. 37 at ¶57. In her declaration, the plaintiff asserts that the first Wurth package "was initially due on June 10, 2020 but the deadline was extended to June 15 because Wurth had yet to provide the missing information." Dkt. No. 38 at ¶4, 7. However, at her deposition, the plaintiff did not specify what date the first Wurth package was due, but expressed her belief that the deadline "got extended by two days for all suppliers, not just [the defendant], based on questions that were not answered by Wurth." Dkt. No. 32-1 at 21 (Tr. p. 79 at lines 22-25, p. 80 at lines 1-8).

Carter filed a declaration stating that "[the plaintiff] complained about confusion from the customer and clarity on the specs that needed to be quoted, but did not timely ask the customer for the information." Dkt. No. 37 at ¶61 (citing Dkt. No. 31 at ¶31). The plaintiff disputes this statement because at his deposition Carter testified that he was not directly involved in any communications with the customer and because the first Wurth package was missing critical information. Id. (citing Dkt. No. 32-2 at 5 (Tr. p. 12 at lines 22-24); Dkt. No. 38 at ¶4). The defendant avers that "[it] was not aware of any

11

questions that the customer did not answer in a timely manner, or information [the plaintiff] could not have obtained if she timely acted on the RFQ." Id. at ¶62.

The defendant contends that, "[p]er Carter, the last discussion of the package he had with [the plaintiff] was in late May and, at that time, [the plaintiff] informed him she had everything she needed from Wurth to complete the RFQ." Dkt. No. 37 at ¶63. The plaintiff disputes that their last discussion was in late May because Carter testified that he vaguely recalled discussing the deadline with the plaintiff on June 8th and remembered that the plaintiff had to go because her mother was calling for help. Id. (citing Dkt. No. 32-2 at 7 (Tr. p. 20 at lines 12-14)). The plaintiff filed a declaration averring that she had repeated interruptions on the first Wurth project during her mother's final days. Dkt. No. 38 at ¶5. The defendant states, "[the plaintiff] did not complete the quote by the end of the first Friday in June, and [the defendant] did not submit the RFQ response by that deadline." Dkt. No. 37 at ¶64.

The defendant asserts that "[a]nother . . . employee who was responsible for the Wurth account, Pat Goss, came to Carter in tears on the following Monday, June 8, because [the plaintiff] still had not completed her work." Id. at ¶65. The defendant says, "Carter reached out to [the plaintiff], who was in Maryland, who informed him she was still working on it." Id. at ¶66. The defendant asserts that "[it] did not submit the package until 8:00 p.m. that Monday" (June 8, 2020). Id. at ¶67.

The plaintiff avers in her declaration that "[she] completed her portion of the 49-part package the evening of Friday June 12, 2020 and the balance of 5 parts on Monday June 15, 2020." Dkt. No. 38 at ¶4. She clarifies that "[t]here was a delay regarding the last 5 parts due to [the defendant's] system would not accept sizes indicated so [the plaintiff] had to quote in a manner that prolonged the process." Id.

Around this same time, Carter expressed concern that the plaintiff was purporting to work full-time—not taking FMLA leave—and demanding full-time pay, while not actually working full-time. Dkt. No. 37 at ¶68. At his deposition, Carter testified he had "great concern that [the plaintiff] was not able to maintain the responsibilities that she was tasked with given the stress of what she was dealing with." Dkt. No. 32-2 at 7 (Tr. p. 20 at lines 1-3). Given this, on June 10, 2020, Carter sent the plaintiff a text encouraging her to take "full FMLA without pay[.]" Dkt. No. 37 at ¶70; see also Dkt. No. 32-6. In this text exchange, Carter said "[the defendant] needs quoting and I understand your situation with Mom." Dkt. No. 37 at ¶70; see also Dkt. No. 32-6. Carter testified that despite this interaction, "'[the plaintiff] always insisted that she wanted to work her 40 hours per week to maintain her pay, her full pay.'" Dkt. No. 37 at ¶69 (quoting Dkt. No. 32-2 at 7 (Tr. p. 18 at lines 23-24)). Carter also told human resources that "he was not happy" that the plaintiff was not getting her work done. Dkt. No. 37 at ¶72.

Sometime in mid-June, the defendant received the second RFQ from Wurth; the parties dispute whether the defendant received this second RFQ

13

before or after June 18, 2020—the date on which the plaintiff's mother passed away. Dkt. No. 37 at ¶¶73-74; see also 36 at ¶10. Regardless, it is undisputed that the defendant's "response to that RFQ was due in the second week of July" (the week of July 6, 2020). In his deposition, Carter specified that the defendant had to "get[] the completed quote entered" on Friday, July 10, 2020, but clarified that he had "requested" the plaintiff complete her portion of the second package by the end of the working day on Thursday, July 9, 2020. Dkt. No. 32-2 at 11 (Tr. p. 36 at lines 17-20, p. 37 at 19-20). Carter explained that he made this request "so that Pat Goss and Tim Mahan would have ample time to put through a good strategy and present pricing that would possibly afford us more of the package." Id. (Tr. p. 36 at lines 20-23). Despite Carter's request, the plaintiff submitted her portion of the second package in the late afternoon of July 10, 2020. See Dkt. No. 32-1 at 23 (Tr. p. 89 at lines9-10). At his deposition, Carter summarized that "[the plaintiff] gave [him] a time that she would have the quote package to [him] by and she was late to that time." Dkt. No. 32-2 at 11 (Tr. p. 37 at lines 22-23).

The plaintiff admits that Carter was not satisfied with her performance regarding the second package and that he did not regard this Wurth package as complete, even though the plaintiff did. Dkt. No. 37 at ¶¶77-78. The plaintiff acknowledged that Carter had concerns that were "the same as the first." Id. at ¶79 (quoting Dkt. No. 32-1 at 23 (Tr. p. 87 at lines 13-19)). Additionally, the plaintiff does not dispute that other employees of the defendant were complaining to Carter or Liter about her performance on the second Wurth

14

package. Id. at ¶80 (citing Dkt. Nos. 31 at ¶45, 32-1 at 23 (Tr. p. 88 at lines 21-24)). However, the plaintiff contends that she completed everything on the second Wurth package that was possible for anyone to complete based on the information provided by Wurth. Dkt. No. 36 at ¶13. The plaintiff says that Carter "was well aware" that "delayed responses, incomplete responses and limited staffing were impeding her ability to complete the RFQ and that she had discussed with Carter that this "disorganization caused further delays and misinformation from Wurth." Dkt. No. 38 at ¶¶6-8. The plaintiff also stated that she "told Carter his July 8, 2020 due date was unrealistic in light of the circumstances." Id. at ¶7.

D.    The Plaintiff's Termination

On July 16, 2020, Carter and Schuppert called the plaintiff to inform her that the defendant was terminating her employment. Dkt. No. 37 at ¶86. They told the plaintiff that she was being terminated based on her performance, particularly her performance related to the two Wurth packages. Id. at ¶87. During the call, the plaintiff disagreed with the defendant's characterization of her performance and asserted that the Wurth packages did not need as much work as the defendant claimed they did. Id. at ¶88. The plaintiff further stated that "they had set her up and were planning it for or [sic] long time in reference to when she took leave." Id.

Carter testified at his deposition that when making his decision to terminate the plaintiff, he did not consider the verbal warning he gave the plaintiff in 2019. Dkt. No. 36 at ¶26. Carter clarified that there were two issues

15

at the time of termination: the plaintiff not performing her duties and "monetary" concerns "due to the Covid constraints." Dkt. No. 32-2 at 4, 5 (Tr. p. 9 at lines 24-25, p. 10 at lines 1-15). Regarding the plaintiff's performance, Carter testified that "[i]n particular there were two Wurth packages that were very important to the company that she failed to deliver on time in both cases." Id. at 5, Tr. p. 10 at 18-20).

Before the termination call, the defendant never informed the plaintiff that her job was in jeopardy under the company's progressive discipline policy, which the defendant followed for an office employee who hadn't used FMLA. Dkt. No. 36 at ¶2. The plaintiff points out that in her only performance review, Carter rated her 44 out of 49. Id. at ¶1.

## II. Summary Judgment Standard

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

16

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [their] favor." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)). Summary judgment is the proverbial "put up or shut up" moment in a lawsuit "when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).

"To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Anderson, 477 U.S. at 255). "However, favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald, 707 F.3d at 730 (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). "A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact" and "a mere disagreement with the movant's asserted facts is inadequate if made without

17

reference to specific supporting material." <u>Smith v. Lamz</u>, 321 F.3d 680, 683 (7th Cir. 2003) (internal quotations and citations omitted).

At summary judgment, the court may "not weigh credibility, balance the relative weight of conflicting evidence, choose between competing inferences, or resolve swearing contests." <u>Flowers v. Renfro</u>, 46 F.4th 631, 636 (7th Cir. 2022); <u>see also</u> <u>Berry v. Chi. Transit Authority</u>, 618 F.3d 688, 691 (7th Cir. 2010) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders."). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## III. Discussion

### A. <u>FMLA Interference</u>

#### 1. *Parties' Arguments*

The defendant argues "[t]here is no evidence in this case that [it] interfered with any of [the plaintiff]'s FMLA rights at all." Dkt. No. 30 at 11. It claims that the undisputed evidence shows that it "granted every FMLA request [the plaintiff] made" and that the plaintiff "was never demoted or fired during any FMLA period." <u>Id.</u> The defendant emphasizes that, "[i]n fact, after [the plaintiff] canceled her first FMLA, [the defendant] *recommended* [the plaintiff] take another FMLA for her mother's care, then granted her request." <u>Id.</u>

18

(emphasis in original). The defendant recounts that the plaintiff "admits that no one [working for the defendant] ever told her not to take the FMLA—in fact, her immediate supervisor encouraged [her], in writing, *to use her FMLA*." Id. (emphasis in original). It contends that the plaintiff "simply chose not to use" her FMLA leave. Id. The defendant says, "It is undisputed that [the defendant] continued to employ [the plaintiff] even after she 'dropped the ball' on the first Wurth package, during the time when she had the right to use her intermittent leave that [the defendant] approved." Id. The defendant summarizes that it "did not terminate [the plaintiff] until after she again 'dropped the ball' on a second Wurth package, and did so during a time when [she] was not even on FMLA— her last FMLA ended on June 18, and [she] was not fired until July 16, after she missed another internal deadline." Id.

The plaintiff responds that the evidence does demonstrate that the defendant interfered with her exercise of her FMLA rights. Dkt. No. 35 at 7. She says that one would "expect Schuppert, the HR Director, to facilitate [the plaintiff]'s leave to care for her dying mother as the law requires" but that, "[u]nfortunately, that protected leave interfered with [the plaintiff]'s ability to crank-out the 50-60 hours of work that Carter was expecting." Id. The plaintiff contends that "Carter interfered with [the plaintiff]'s leave by requiring [the plaintiff] to give him a block of time she would be working during her FMLA period, expecting that she would continue to put in 50-60 hour workweeks even with one weekly day of furlough while she cared for her mom." Id. (citing Dkt. No. 36 at ¶5). The plaintiff says that "Carter also required [her] for the first

time to provide Carter with her communications to the sales staff." Id. (citing Dkt. No. 36 at ¶6).

The plaintiff compares her circumstances to those of the plaintiff in Lewis v. School District # 70, 523 F.3d 730, 743 (7th Cir. 2008), in which "the Seventh Circuit reversed the district court's grant of summary judgment for the employer on an FMLA claim." Id. at 8. The plaintiff states that in Lewis, "the employee offered evidence that her employer had expected her to complete all the duties of a full-time bookkeeper while she was taking intermittent FMLA leave, and then fired her for failing to meet that full-time standard." Id. (citing Lewis, 523 F.3d at 736-37). The plaintiff continues, "[t]he Lewis court concluded that the performance problems that supposedly justified the termination were a direct result of her FMLA leave so that termination for those reasons would have made her FMLA leave 'illusory.'" Id. (citing Lewis, 523 F.3d at 743). The plaintiff asserts that her "struggle to care for her mother at the same time she dealt with the customer's late and missing information, as well as the sales department's failure to stay current, were the direct cause of the conflict between [the plaintiff] and her employer." Id. at 9 (Dkt. No. 36 at ¶¶7-14). She contends that "Liter and Carter had no choice but to allow [her] to take intermittent leave, but they certainly did not like that it hindered [her] ability to keep-up with her daily tasks and admitted that they were motivated to fire her for it." Id. The plaintiff ends by asserting that "Carter admits that he terminated [her] because she was not able to keep-up with her workload given

20

the stress that she was dealing with during her FMLA leave." Id. (citing Dkt. No. 36 at ¶¶19, 25).

The defendant replies that the plaintiff's circumstances are materially different from those the Lewis court considered. Dkt. No. 41 at 9 (citing Lewis, 523 F.3d 730). The defendant asserts that "[the plaintiff]'s case is distinguishable from Lewis on a critical fact—the Lewis plaintiff actually used her intermittent FMLA leave and was (arguably) fired for doing so, whereas [the plaintiff] never took her intermittent leave at all." Id. It says that "[w]hereas Ms. Lewis was punished for absenteeism or not getting her work done because she provided notice and took her unpaid leave, [the plaintiff] simply chose not to do so—even when [the defendant] requested her to do so." Id. at 10 (citing Dkt. No. 32-6). The defendant argues that, unlike Lewis, "[t]here is no interference here" because "[i]t is undisputed [the defendant] granted [the plaintiff] every FMLA request she made, including for intermittent leave." Id. The defendant reiterates that "[the plaintiff] chose not to take [the intermittent leave], and took full-time pay from [the defendant] instead." Id. Based on this, the defendant concludes that, "unlike in Lewis, [the plaintiff's] FMLA claim fails as a matter of law." Id.

At the September 5, 2024 hearing, the plaintiff argued—for the first time—that the defendant had interfered with her FMLA rights by insisting that any FMLA leave would have to be unpaid. See Dkt. No. 48. The plaintiff's counsel made this legal argument when the court asked whether the plaintiff had ever taken any unpaid FMLA. Id. Without providing a specific statutory citation, counsel contended that state and federal law regarding FMLA leave

21

prohibited an employer from dictating whether an employee could substitute her paid vacation time for unpaid FMLA leave. Id. The court understood counsel to then assert that it did not matter whether the plaintiff ever took any unpaid FMLA leave because the protections of the FMLA kick in when an employee has given her employer with notice that she will need to take FMLA leave. Id. (citing 29 CFR §§825.302(c), 825.303(b), 825.305(d)). Counsel then confirmed that the plaintiff never took unpaid FMLA leave. Id.

      2.    *Legal Standard*

The FMLA was designed "to balance the demands of the workplace with the needs of families" while guaranteeing workers reasonable access to medical leave "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. §2601(b)(1)-(3). The statute grants eligible employees up to twelve workweeks of unpaid leave (480 hours) per year for medical and family reasons. See 29 U.S.C. §2612(a)(1) & (c). An eligible employee is entitled to restoration to the same or equivalent job and benefits when the leave ends, and to continuation of health insurance during leave. 29 U.S.C. §2614(a)(1) & (c)(1).

Under 29 U.S.C. §2615(a)(1), it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. §2615(a)(1). To prevail on a FMLA interference claim, a plaintiff must show that (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer interfered with, restrained, or denied FMLA

22

benefits to which she was entitled. <u>Juday v. FCA US LLC</u>, 57 F.4th 591, 595 (7th Cir. 2023) (citing <u>Ziccarelli v. Dart</u>, 35 F.4th 1079, 1089 (7th Cir. 2022)). "[D]enial of FMLA benefits is not required to demonstrate an FMLA interference violation[;] [i]nterference or restraint alone is enough to establish a violation, and a remedy is available under §2617 if the plaintiff can show prejudice from the violation." <u>Ziccarelli</u>, 35 F.4th at 1089. "Interference also encompasses 'us[ing] the taking of FMLA leave as a negative factor in employment actions' and 'discouraging an employee from using such leave.'" <u>Preddie v. Bartholomew Consol. Sch. Corp.</u>, 799 F.3d 806, 818 (7th Cir. 2015) (quoting 29 C.F.R. §825.220(c)). "An interference claim does not require an employee to prove discriminatory intent on the part of the employer; rather, such a claim 'requires only proof that the employer denied the employee his or her entitlements under the Act.'" <u>Scruggs v. Carrier Corp.</u>, 688 F.3d 821, 825 (7th Cir. 2012) (quoting <u>Shaffer v. Am. Med. Ass'n</u>, 662 F.3d 439, 443 (7th Cir.2011)).

3. *Analysis*

The parties agree that the plaintiff has satisfied the first four elements of a FMLA interference claim (she was eligible for FMLA protections, the defendant was covered by the FMLA, she was entitled to take leave under the FMLA and she provided the defendant with sufficient notice that she intended to take leave). They dispute only the fifth element: whether the defendant interfered with, restrained or denied FMLA benefits to which the plaintiff was entitled. <u>See</u> <u>Juday</u>, 57 F.4th at 595. The plaintiff has failed to prove facts to support the fifth element.

23

The undisputed facts show that the defendant never denied the plaintiff's requests for FMLA leave. The defendant approved the plaintiff's first FMLA request related to her elective surgery and—following her withdrawal of that first FMLA request—approved the plaintiff's second FMLA request related to her mother's end-of-life care. Dkt. No. 37 at ¶¶36, 45. After the defendant approved her second FMLA request, the plaintiff *had the option* to take unpaid FMLA. But the plaintiff *elected* not to take unpaid FMLA so that she could receive her full salary. Id. at ¶¶54-55, 69. The plaintiff cannot base her FMLA interference claim on a denial of an FMLA request, because the defendant never denied a request for FMLA leave.

In asserting that the defendant otherwise interfered with or restrained her FMLA benefits, the plaintiff primarily points to Carter's expectations and procedures for her while she was in Maryland caring for her mother. Dkt. No. 35 at 7. But the plaintiff's reliance on Carter's expectations and procedures ignores the fact she elected not to take any unpaid FMLA leave. The record reflects that Carter had these expectations and imposed these procedures to accommodate the plaintiff's choice to work full-time—to perform all her full-time duties—while she was in Maryland. The plaintiff's argument also minimizes the fact that Schuppert and Carter both encouraged the plaintiff to take FMLA leave. The record shows that on May 18, 2020, Schuppert recommended that the plaintiff take FMLA leave to care for her mother; on June 10, 2020, Carter texted the plaintiff to encourage her to take "full FMLA without pay[.]" Dkt. No. 37 at ¶¶43, 70; see also Dkt. No. 32-6. According to his

24

deposition, after the plaintiff's mother passed away, Carter informed the plaintiff that "she was entitled to bereavement time" and he "encouraged [the plaintiff] to take her time to grieve[.]" Dkt. No. 32-2 at 8 (Tr. p. 24 at lines 17-25, p. 25 at lines 1-3). The plaintiff has not proven that the defendant restrained or interfered with her FMLA benefits.

The plaintiff's reliance on <u>Lewis</u> is unconvincing. As the plaintiff explains, in <u>Lewis</u> "the employee offered evidence that her employer had expected her to complete all the duties of a full-time bookkeeper while she was taking intermittent FMLA leave, and then fired her for failing to meet that full-time standard." Dkt. No. 35 at 8 (citing <u>Lewis</u>, 523 F.3d at 736-37). The plaintiff failed to mention, however, that the employee in <u>Lewis</u> also offered evidence that "[s]he never was credited for her time spent working at home" and that "*she was not paid* for the days on which she took FMLA leave." <u>Lewis</u>, 523 F.3d at 736 (emphasis added). Based on this evidence, the <u>Lewis</u> court determined that "[a] reasonable jury could conclude that the [the employer] . . . expected [the employee] to complete all of the duties of a full-time bookkeeper *while she was working (and being paid) on an essentially part-time basis.*" <u>Id.</u> at 743 (emphasis added). The plaintiff's circumstances are materially different from those in <u>Lewis</u>. No reasonable jury could conclude the defendant expected the plaintiff to complete all the duties of a full-time employee "while she was working (and being paid) on an essentially part-time basis[,]" because the plaintiff admits that she was working and being paid on a full-time basis. The fact that in this case, the defendant expected the plaintiff to complete all the

25

duties of a full-time employee does not constitute interference with the plaintiff's FMLA rights.

The plaintiff has waived the argument that the defendant interfered with her FMLA rights by insisting that any FMLA leave would have to be unpaid. The plaintiff presented this argument for the first time at the September 5, 2024 hearing—almost eighteen months after the summary judgment motion was fully brief and at a hearing that the court had told the parties it was scheduling for the purpose of allowing the parties to answer the court's questions about *factual* details. See Dkt. Nos. 46; 48. By failing to make this legal argument in opposition brief, then raising it (without seeking leave of court) at a fact hearing, the plaintiff has, in effect, made the argument in an unapproved sur-reply. See Brim v. Stevens, Case No. 18-CV-24-JDP, 2019 WL 112615, at *2 (W.D. Wis. Jan. 4, 2019) ("Arguments raised for the first time in a reply brief (and, by extension, a sur-reply brief) are typically considered waived." (citing Carter v. Tennant Co., 383 F.3d 673, 679 (7th Cir. 2004))); Civil Local Rule 7(e) (E.D. Wis.) ("The Court will hear oral argument *at its discretion.* (emphasis added)).

Even if the plaintiff had not waived this argument, she failed to cite specific legal authority—at the September 5 hearing or otherwise—supporting her argument that she has a right to substitute paid vacation time for unpaid FMLA leave. See United States v. Beavers, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). The court did its own research; it

26

appears the federal law that plaintiff's counsel may have been referring to is 29

CFR §825.207, which states in relevant part:

> *Generally, FMLA leave is unpaid leave.* However, under the circumstances described in this section, FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave. . . . *An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy.* When an employee chooses, or an employer requires, substitution of accrued paid leave, the employer must inform the employee that the employee must satisfy any procedural requirements of the paid leave policy only in connection with the receipt of such payment. See §825.300(c). If an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave. Employers may not discriminate against employees on FMLA leave in the administration of their paid leave policies.

29 CFR §825.207(a) (emphasis added).

If this is the regulation upon which the plaintiff's counsel relied, it

contains important caveats that the plaintiff did not address. For example,

§825.207(a) states that "[a]n employee's ability to substitute accrued paid leave

*is determined by* the terms and conditions of the employer's normal leave

policy." Id. §825.207(a) (emphasis added). The plaintiff presented no evidence

regarding the defendant's "terms and conditions" for its "normal leave policy."

For all these reasons, the plaintiff's argument is waived and is, otherwise,

unpersuasive.

The plaintiff has failed to present evidence sufficient to prove the fifth

element of an FMLA interference claim. The court will grant the defendant's

motion for summary judgment as it relates to the interference claim.

27

B.    FMLA Retaliation

     1.    *Parties' Arguments*

The defendant argues that "[t]here is no evidence of any causal connection between any FMLA time taken by [the plaintiff], and [the defendant's] July 16 termination of her employment." Dkt. No. 30 at 13. The defendant recounts that it approved both the plaintiff's requests for FMLA leave and that it took no adverse actions against the plaintiff—not when she applied for FMLA leave, not when the defendant approved her FMLA leave, not when she canceled her first FMLA leave request and not during the time she was approved to take intermittent FMLA leave. Id. The defendant contends that "[it] could not have retaliated against [the plaintiff] for taking FMLA time" because, "by her own admission, [the plaintiff] never took any FMLA leave time." Id. The defendant also observes that "[the plaintiff] admits no one at [the defendant] ever told her not to use her intermittent FMLA[.]" Id. It argues that "[the defendant's] Human Resources Director encouraged [the plaintiff] to take the FMLA leave in the first place (then approved it)" and that "[the plaintiff's] supervisor, Carter, encouraged her, in writing, to take the leave." Id. The defendant states that it "is likewise not aware of, nor has [the plaintiff] identified, any similarly situated employees who were treated differently from [her] and who did not request FMLA." Id.

The defendant argues that "[t]here is not even suspicious timing here." Id. It recounts that "[the plaintiff]'s ability to take her intermittent FMLA ended on June 18" and that "[the plaintiff] was not terminated until July 16, after she

28

missed yet another deadline." Id. The defendant contends that it terminated the plaintiff only after she "dropped the ball" on both Wurth packages. Id. at 14. It asserts that "[the plaintiff] admits she chose to take full-time pay from [the defendant] rather than use her FMLA leave, and that meant [the defendant] had the right to impose fulltime performance expectations." Id. The defendant maintains that the plaintiff "wants to have her cake and eat it too" because "[s]he wants the protection of FMLA to excuse any of her shortfalls in her work performance[;] [b]ut, she rejected using the FMLA because she wanted more money." The defendant says that "[t]he law allows no such thing." Id.

The plaintiff responds that "[t]he evidence shows that the termination of [her] employment was motivated, at least in part, by her taking FMLA leave." Dkt. No. 35 at 3. She maintains that "[b]inding Seventh Circuit precedent provides for the use of a mixed-motive standard for proving FMLA retaliation." Id. at 4 (citing Lewis, 523 F.3d at 741-742). The plaintiff says that "Liter and Carter were upset that [she] was taking FMLA leave." Id. at 3 (citing Dkt. No. 36 at ¶4). She claims that, "[i]n addition to being unhappy about [the plaintiff] taking leave, Carter expected [the plaintiff] to work 50 to 60 hours per week even though he knew that [she] was being pulled in two different directions and that caring for her mother was interfering with her focus on the job." Id. (citing Dkt. No. 36 at ¶¶9, 18). The plaintiff says that Carter thought she was not as productive while out of state and says, "Carter admitted that he made the decision to terminate [the plaintiff] based on his grave concerns that [she] was not able to maintain the responsibilities she was tasked with given the stress

that she was dealing with during her FMLA leave." Id. at 3-4 (citing Dkt. No. 36 at ¶¶19-20). The plaintiff insists that the record reflects that "Carter was motivated, at least in part, to terminate [the plaintiff] because her FMLA leave interrupted her normal workflow." Id. at 4.

The plaintiff also argues that the defendant's proffered reason for terminating her was a pretext for discrimination. Id. at 9. The plaintiff says that, "[n]ot surprisingly, an employer's prior treatment of the plaintiff and/or other employees who sought to take FMLA leave has been found relevant to determining pretext." Id. (citing Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117 (10th Cir. 2003)). The plaintiff says that she received a 44 out of 49 on her only performance review from Carter and that she was not afforded the protections of a progressive discipline policy, like another office employee. Id. at 10. She asserts that "[t]he inference of discrimination is clear from [the defendant] taking its first adverse action immediately after [the plaintiff] took FMLA-qualifying leave in April, May and June and admitting that the termination was motivated by the interruptions caused to [the plaintiff]'s workflow." Id. The plaintiff argues that "[b]ecause a reasonable jury could believe that Wrought fired [the plaintiff] because of her FMLA leave, summary judgment is not appropriate." Id.

The defendant replies that the two facts cited by the plaintiff—(1) Liter and Carter being "upset" with the plaintiff taking leave and (2) the defendant expecting her to perform her full duties while she cared for her mother—are not sufficient to create a reasonable inference of retaliation. Dkt. No. 41 at 3.

Starting with the allegations of Liter and Carter being "upset," the defendant contends that "the temporal gap alone defeats any inference of retaliation" because the three interactions with Liter and Carter referenced by the plaintiff occurred *before* the defendant approved the plaintiff's FMLA requests in mid-May 2020—"meaning, that two to three months passed between these events and [the plaintiff's] July 16 termination." Id. at 4. The defendant asserts that, "even if [the plaintiff] could demonstrate any sufficient temporal proximity between these events (which she cannot), intervening events—such as poor work performance—break any chain of causation to evidence retaliation." Id. The defendant identifies several intervening events that occurred "*after* these allegedly expressed 'frustrations[,]'" including the defendant approving both of the plaintiff's FMLA requests, Schuppert and Carter recommending that the plaintiff take FMLA leave, the plaintiff electing to not take unpaid FMLA leave and the plaintiff performing poorly on the two Wurth packages. Id. at 5-7 (emphasis in original). The defendant argues that "[c]ourts are not sympathetic to these inferences [of retaliation] at all when an employer has approved all prior FMLA requests, or when an employee is granted intermittent FMLA but never uses it (or never gives notice to use it)." Id. at 7.

The defendant contends that "[the plaintiff]'s argument that she could not keep up with her work because of the demands of her mother's care is fatally flawed" because "she refused to use the leave." Id. at 8. It asserts that "[i]f [the plaintiff] was too busy caring for her mother, she should have followed Carter's instruction to take FMLA leave to do it." Id. (citing Dkt. No. 32-6). The

31

defendant argues that "[the plaintiff] cannot have it both ways—refuse to use FMLA leave, but then have her performance excused because she was caring for her mother (the thing for which she was granted FMLA leave)." Id. The defendant maintains that "there is no evidence that would classify [its] reason for terminating [the plaintiff]—economics and performance—as a pretext." Id. The defendant continues, "There is no evidence sufficient that [the defendant] did not honestly believe [the plaintiff] underperformed, or any evidence of a pattern of contradictions and inconsistencies on [the defendant's] part to justify such an inference." Id. It says that "[the plaintiff] accepted full-time pay for full-time performance, and if she wanted an excuse for interruptions in her workflow, she simply needed to use the intermittent FMLA leave granted to her." Id. at 11. The defendant argues that the plaintiff has provided no grounds for avoiding summary judgment on the issue of pretext. Id.

### 2. *Standard*

The FMLA "forbids an employer from retaliating against an employee who exercises FMLA rights." Burnett v. LFW Inc., 472 F.3d 471, 477 (7th Cir. 2006) (citing 29 U.S.C. §2615(a)(2)). "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." Pagel v. TIN Inc., 695 F.3d 622, 631 (7th Cir. 2012) (citing Breneisen v. Motorola, Inc., 512 F.3d 972, 978 (7th Cir. 2008)). To prevail on a claim for retaliation in violation of the FMLA, a plaintiff must show that (1) she engaged in FMLA-protected activity; (2) her employer took an adverse employment action against her; and (3) there is a causal connection

between the two. <u>Juday</u>, 57 F.4th at 596 (citing <u>Curtis v. Costco Wholesale Corp.</u>, 807 F.3d 215, 220 (7th Cir. 2015)). "The causal-nexus element may be met through either a direct admission . . . or through 'a convincing mosaic of circumstantial evidence' permitting that same inference." <u>Pagel</u>, 695 F.3d at 631 (quoting <u>Ridings v. Riverside Med. Ctr.</u>, 537 F.3d 755, 771 (7th Cir. 2008)). "The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." <u>Id.</u> (citing <u>Jajeh v. County of Cook</u>, 678 F.3d 560, 570 (7th Cir. 2012)).

"[T]he claim requires proof of discriminatory intent—evidence that the employer 'was acting under a prohibited animus.'" <u>Juday</u>, 57 F.4th at 596 (quoting <u>Cracco v. Vitran Express, Inc.</u>, 559 F.3d 625, 634 (7th Cir. 2009)); <u>see also</u> <u>Tibbs v. Admin. Off. of the Ill. Cts.</u>, 860 F.3d 502, 505 (7th Cir. 2017) ("The critical question is simply whether the inference of unlawful intent is reasonable (at summary judgment) or correct (at trial)."). An employee "does not need to prove that 'retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" <u>Anderson v. Nations Lending Corp.</u>, 27 F.4th 1300, 1307 (7th Cir. 2022) (quoting <u>Lewis</u>, 523 F.3d at 741-42).

Suspicious timing is rarely enough, by itself, to support a claim of retaliation under the FMLA; a plaintiff ordinarily must present other evidence

that the employer's explanation for the adverse action was pretext for retaliation. Tibbs, 860 F.3d at 505; see also Kidwell v. Eisenhauer, 679 F.3d 957, 967 (7th Cir. 2012) ("[W]here a significant intervening event separates an employee's protective activity from the adverse employment action he receives, a suspicious timing argument will not prevail.").

"Pretext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" Tibbs, 860 F.3d at 506 (quoting Burton v. Bd. of Regents of the Univ. of Wis. Sys., 851 F.3d 690, 698 (7th Cir. 2017)). "Merely disagreeing with an employer's reasons does not meet this standard." Id.; see also Stockwell v. City of Harvey, 597 F.3d 895, 902 (7th Cir. 2010) ("Courts are not 'superpersonnel department[s]' charged with determining best business practices." (citation and quotations omitted)). Instead, "[a] plaintiff must point to 'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate' the termination." Tibbs, 860 F.3d at 506 (quoting Carter v. Chi. State Univ., 778 F.3d 651, 659 (7th Cir. 2015)).

        3.    *Analysis*

The parties agree that the plaintiff engaged in FMLA-protected activity and that the defendant took an adverse employment action against her. See Juday, 57 F.4th at 596. They dispute the third element—whether there is a causal connection between the FMLA-protected activity and the adverse employment action. The plaintiff has failed to make a showing sufficient to

34

prove the third element because the "mosaic of circumstantial evidence" she presents does not create a reasonable inference of unlawful intent.

The plaintiff has not identified sufficient evidence to show that the defendant's stated reason for her termination—poor performance—is pretextual. Because the plaintiff *elected* not to take any unpaid intermittent FMLA leave—even though the defendant approved her taking such leave and encouraged her to take such leave—the defendant reasonably expected the plaintiff to perform her full duties. One of the plaintiff's key duties included responding to RFQs in an "[e]ffective and timely" manner. Dkt. No. 37 at ¶¶13, 15. The defendant determined that the plaintiff "dropping the ball on either Wurth package would have warranted termination[,]" because these were "very important packages for a large piece of business that [the defendant was] hoping to gain." Dkt. No. 37 at ¶56, 59. The undisputed record reflects that Carter was "not satisfied" with the plaintiff's performance on either Wurth package and that the plaintiff failed to timely submit her portion of at least one of the Wurth packages. The record shows that Carter did not consider the plaintiff's submissions to be complete and that other employees expressed concerns about the plaintiff's performance. Dkt. No. 37 at ¶¶65, 80; see also Dkt. No. 32-1 at 23 (Tr. p. 87 at lines 13-25, p. 88 at lines 1-24). Despite the plaintiff's conclusory statements that both Wurth packages were "timely submitted," her own admissions show that she did not submit her portion of the second Wurth package by the deadline Carter set. See Dkt. Nos. 32-1 at 23 (Tr. p. 89 at lines 9-14); 32-2 at 11 (Tr. p. 36 at lines 15-25, p. 37 at lines 1-

23). On this record, the plaintiff has not shown that the defendant's stated reason for her termination—poor performance—is "factually baseless" or "insufficient to motivate [her] termination." See Tibbs, 860 F.3d at 506 (internal quotation marks omitted).

Nor has the plaintiff identified sufficient evidence to show that her poor performance was not the actual motivation for the discharge or that the defendant was motivated by other discriminatory purposes. The three interactions she identifies as establishing that "Liter and Carter were upset that [she] was taking FMLA leave" are too temporally distant—and separated by intervening events—to support an inference of unlawful intent at the time of the plaintiff's termination. Dkt. No. 35 at 3. The interactions took place sometime between the date on which the plaintiff submitted her first FMLA request—April 14, 2020—and the date on which the defendant approved that request—May 13, 2020. Dkt. No. 36 at ¶4; see also Dkt. No. 32-1 at 15-17 (Tr. p. 54-65). This means they occurred at least two months before the plaintiff's July 16, 2020 termination. Dkt. No. 37 at ¶86. In those intervening months several significant events occurred, including the defendant approving the plaintiff's two FMLA requests and the defendant being dissatisfied with the plaintiff's performance related to the two Wurth packages. Dkt. No. 37 at ¶¶36, 45, 64, 76-79. These intervening events—especially the plaintiff's poor performance on the two Wurth packages—diminish the impact of the three interactions that the plaintiff alleges show that "Liter and Carter were upset that [the plaintiff] was taking FMLA leave. The fact Schuppert and Carter both

36

encouraged the plaintiff to take unpaid FMLA leave runs directly counter to the plaintiff's claims of a retaliatory intent.

Even without the temporal distance and the intervening events, the incidents the plaintiff has identified do not support an inference of unlawful intent. The plaintiff's testimony that Carter mistakenly told her that she had to take one to two weeks of vacation before using FMLA leave, but that she corrected him based on what Denise Schuppert had told her, does not imply that the defendant terminated her in retaliation for taking leave. At best, one might be able to infer from this exchange that the plaintiff thinks Carter was mad at her for correcting him—not for the fact that she took leave (which, as the court has explained, she did not take). The plaintiff's testimony that when Liter came to her with a question about something, he commented, "I can't believe you're going to be gone," does not support an inference of unlawful intent. Liter did not say, "I can't believe you are abandoning us," or "I can't believe you are taking leave right when we are really busy." There is no evidence in the record regarding what Liter meant by the statement, and the statement easily could be interpreted as Liter telling the plaintiff she'd be missed. Finally, the plaintiff's testimony that she overheard parts of a conversation between Liter and Carter, where they said the plaintiff's name and "FMLA", does not support an inference of unlawful intent. The plaintiff admits that she could hear "nothing specific." She admits that she "drew the conclusion that there was frustration that [she] was taking off, based on the volume of the discussion and tenor following it." She has not explained what

37

she means by the "volume" of the discussion or the "tenor," and there is no way for the court—or the plaintiff—to know what the two may have been discussing.

Because the plaintiff has failed to make a showing sufficient to support her FMLA retaliation claim, the court will grant the defendant's motion for summary judgment as it relates to the retaliation claim.

## IV. Final Remarks

The court understands that the plaintiff found herself in a difficult, emotionally draining position. In April of 2020—as the country was starting to become aware of the threat posed by the COVID-19 pandemic—the plaintiff needed surgery. She asked for FMLA leave, as she had the right to do. But she never got a chance to take that leave—her surgery was canceled because of the pandemic. At the same time this turn of events occurred, the plaintiff's mother was reaching the end stage of her life and needed care. The plaintiff was faced with a choice—take FMLA leave (intermittent or full) for which she would not be paid or continue to be paid but be unable to take leave. Although the defendant approved her request for intermittent FMLA leave, the plaintiff elected not to use it (and to continue to receive her full-time pay). Doubtless this resulted in a great deal of physical and emotional stress on the plaintiff. Anyone trying to work full-time while caring for a loved one as that loved one is dying would be stressed to human limits. What the plaintiff wants is a statute that would have entitled her to take *paid* leave, so that she could both care for her mother and continue receiving income. But that is not what the FMLA provides. The FMLA

38

provides only unpaid leave, and the plaintiff chose (perhaps quite understandably) not to take that unpaid leave. Because she did not use the benefits to which she was entitled under the FMLA, she cannot prove that the defendant violated that statute.

## V. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 29.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 7th day of November, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**